# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 |
| ZERGA PHIN-KER LP, | § § | |
| DEBTOR. | § § § | CASE NO. 15-42087-BTR (Complex Case Designation Requested) |

## AFFIDAVIT OF ROSE RABON IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR EXPEDITED RELIEF

STATE OF TEXAS      §
                        §
COUNTY OF COLLIN   §

        Rose Rabon, upon first being duly sworn, and pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure, deposes and says:

        1.     I am contracted by and serve as the Chief Financial Officer ("**CFO**") of Zerga Development, LLC ("**Development**") and Zerga Management, LLC ("**Management**"). Prior to the Petition Date, and to the best of my understanding based upon my review of constituent documents, in and around June/July 2013, Zerga Phin-Ker LP, the debtor and debtor in possession ("**Debtor**") in the above captioned chapter 11 case, engaged Development and Management to provide wide ranging services to the Debtor including services relating to the development, construction, promotion, marketing, operation, repair and maintenance of the Facilities (defined below) and to act as the authorized agent of the Debtor in performing such services. In my position with both Development and Management, I am involved and am familiar with the day-to-day operations, business, and financial affairs of the Debtor.

4811-1022-9291.5

2.     I set forth the following in support of the Debtor's Chapter 11 petition and requests for relief filed contemporaneously herewith.

# I.
# INTRODUCTION

3.     The Debtor is a Texas limited partnership whose principal place of business is in McKinney, Texas.  The Debtor is engaged in the acquisition, construction and development of two healthcare facilities located in Longview, Texas.

4.     On November 20, 2015, the Debtor commenced its Chapter 11 case (the "**Case**") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Eastern District of Texas.

5.     Concurrent with the filing of this Affidavit, the Debtor has also filed certain applications and motions seeking various types of relief (the "**Expedited Motions**").   The Expedited Motions are:

(a)    *Expedited Motion of the Debtor Seeking Interim and Final Orders (1) Authorizing the Debtor to Obtain Post-Petition Financing, (2) Granting Liens and Super-Priority Administrative Status, (3) Modifying the Automatic Stay, and (4) Setting and Prescribing Form and Manner of Notice for Final Hearing* (the "**DIP Financing Motion**");

(b)    *Debtor's Expedited Application for Entry of an Order Authorizing the Employment and Retention of CohnReznick LLP as Restructuring Advisor and Designating Chad J. Shandler as Chief Restructuring Office* (the "**CohnReznick Application**");

(c)    *Expedited Motion for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Utilities Motion**"); and

4811-1022-9291.5

(c)     *Debtor's Expedited Motion for Authority to Meet Obligations Under Insurance Premium Finance Agreement* (the "**Premium Finance Motion**").

6.      The Expedited Motions focus on: (a) approval of post-petition secured financing pursuant Section 364 of the Bankruptcy Code; (b) approval of the Debtor's retention of CohnReznick LLP as the Debtor restructuring advisor and designating Chad J. Shandler as Debtor's chief restructuring officer on and after December 15, 2015 as required by the Debtor's post-petition lender; (c) approval of proposed adequate assurance of payment to utility companies to ensure uninterrupted services; and (d) obtaining authority to continue making payments for insurance premium financing..

7.      I began serving as CFO of Development and Management in March 2014.  I have more than 30 years of financial management experience in the accounting and senior living and healthcare industries.  I have a Bachelor of Business degree in Economics and Accounting and a Master in Business Administration from the University of Oklahoma.  I am a Certified Public Accountant and a Certified Forensic Examiner.

8.      Development was engaged by the Debtor pursuant to that certain Development Agreement executed between Development and the Debtor dated on or about June 20, 2013 (the "**Development Agreement**").  Pursuant to the Development Agreement, Development provides services and performs tasks that are necessary and appropriate to facilitate and effect the construction of the Facilities.

9.      Management was engaged by the Debtor pursuant to two management agreements executed between Management and the Debtor and dated in and around July 2013 (collectively, the "**Management Agreements**").  Pursuant to the Management Agreements, Management proposes marketing plans, prepares operational and capital budgets, manages

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 3**

leases, prepares financial reports, and acts as the paying agent in the conduct of business for the Debtor.

10.     I have knowledge of, and familiarity with the Debtor's operational and financial affairs. I, or the employees of Development or Management under my supervision, have participated in negotiations with the Debtor's secured lender, vendors, prospective residents and others. Serving as the CFO of both Development and Management, I am familiar with the Debtor's construction matters, business development plans, operations and financial management. Except as otherwise indicated, all statements in this Affidavit are based upon my personal knowledge, my review of the Debtor's books and records, and other relevant documents, or upon my opinion based upon my experience with the Debtor's operations and financial condition. In making the statements herein, based upon the foregoing, I have relied in part upon others to accurately record, prepare, and collect any such documentation and other information.

11.     I submit this Affidavit in support of the Debtor's bankruptcy petition and the Expedited Motions. Serving as CFO of Development and Management, and pursuant to the Development Agreement and Management Agreements, I am authorized to submit this Affidavit on behalf of the Debtor.

12.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, knowledge gained through review of documents including but not limited to "Bond Documents" defined below, or upon my professional opinion.

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 4**

13.     Part II of this Affidavit provides the background developments which led to the Debtor's Chapter 11 filing and the Debtor's goals in this Case. Part III sets forth facts relevant to consideration of the Expedited Motions.

**II.**
**BACKGROUND LEADING UP TO CHAPTER 11 FILING**

A.     **Acquisition and Financing of the Facilities.**

14.     The Debtor, a Texas limited partnership, acquired certain real property (the "**Real Property**") in Longview, Texas, and developed two healthcare facilities thereon.    The development is generally known as "Parkview on Hollybrook" and consists of two separate healthcare facilities: an independent living facility (the "**IL Facility**"), and an assisted living and memory care facility (the "**AL Facility**", and collectively with the IL Facility the "**Facilities**").

15.     The Debtor obtained public financing to fund the acquisition of the Real Property and construction of the Facilities.    Pursuant to the Health Facilities Development Act, municipalities are granted the authority to issue bonds and loan the proceeds thereof to provide for the financing and refinancing of the acquisition, construction or installation of health facilities and refunding of its outstanding bonds issued for such purposes.    Utilizing this authority, the City of Windthorst, Texas, created the Red River Health Facilities Development Corporation ("**Issuer**"), a nonprofit health facilities development corporation, to facilitate the financing for the construction of the Facilities ("**Bond Financing**").

16.     Issuer issued the First Mortgage Revenue Bonds Series 2013A ($27,480,000) and Taxable Series 2013B ($6,430,000) (collectively, the "**Bonds**") in the original aggregate principal amount of $33,910,000.    The Bonds were sold and the Issuer loaned the proceeds to the Debtor (the "**Bond Debt**") pursuant to that certain Loan Agreement dated as of June 1, 2013

4811-1022-9291.5

(the "**Loan Agreement**") executed between the Debtor and Issuer. The loan was evidenced by the certain Senior Series 2013A Note in the principal amount of $27,480,000 and the Senior Series 2013B Note in the principal amount of $6,430,000 (the "**Notes**") executed by the Debtor. Pursuant to that certain Indenture of Trust dated as of June 1, 2013 (the "**Bond Indenture**") executed between the Issuer and U.S. Bank National Association ("**US Bank**"), the Issuer appointed US Bank as the bond trustee ("**Bond Trustee**").

17.     The Debtor's obligations under the Loan Agreement and Notes are secured by, among other things, that certain Master Trust Indenture, Deed of Trust and Security Agreement dated as of June 1, 2013, as supplemented and amended by that Supplemental Indenture Number 1 dated as of the same date (the "**Deed of Trust**") executed by the Debtor and US Bank as master trustee (the "**Master Trustee**", and in either or both its capacities as Bond Trustee or Master Trustee, the "**Indenture Trustee**"). The Deed of Trust was filed and recorded in the Official Public Records of Gregg County, Texas, on July 5, 2013. The Bonds, Loan Agreement, Notes, Bond Indenture, and Deed of Trust are hereunder collectively referred to as the "**Bond Documents**".

18.     Under the Bond Documents, the proceeds from the Bonds loaned to the Debtor were deposited into several fund "buckets", each with a different purpose. The different funds and separate accounts created thereunder and the balance in each such fund/account as of the Petition Date were as follows:

| | | |
|---|---|---|
| Construction Fund | Funded Interest Account | $0.86 |
| | Project Account | $1,393,440.60 |
| Working Capital Fund | General Account | $453,196.00 |
| | Deferred Fee Account | $1,179,869.27 |

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 6**

| Bond Fund | Principal Account | $56,667.77 |
|---|---|---|
| | Interest Account | $837,361.42 |
| Reserve Fund | | $2,667,843.50 |
| Revenue Fund | | $0 |
| Rebate Fund | | $0 |
| Total | | $6,588,379.42 |

19.     The Bond Documents set forth the parameters and limitations within which funds from each such "bucket" may be used by the Debtor.

**B.     The Debtor's Equity and Governance Structure.**

20.     The Debtor's equity and governance structure is as follows:



21.     The Debtor, a limited partnership, acts through its General Partner, Zerga Phin-Ker Genpar, LLC ("**Genpar**").   Genpar, a limited liability company, acts through its two officers: Co-Presidents each with a 50% vote in decision making authority.   The two Co-

Presidents of Genpar are Mr. Jerry Green and Mr. Kendall Phinney. Mr. Green and Mr. Phinney share authority over the management of the Debtor's affairs.

22.     Zerga Investments I, Ltd., an entity in which Mr. Green is a principal, holds a 50% member interest in Genpar. Phin-Ker Ventures, LLC, an entity in which Mr. Phinney is a principal, holds the other 50% member interest in Genpar. Phin-Ker Ventures, LLC also holds a 1.67% limited partner interest in the Debtor.

23.     Additionally, Mr. Phinney and Mr. Green, each in his individual capacity is a limited partner of the Debtor.

24.     The Debtor's daily operations are managed pursuant to the Management Agreements, one each for the AL Facility and the IL Facility. The managing member of Management is Mr. Green, who, as identified above, is an insider of the Debtor. Pursuant to the Management Agreements, Management is responsible for the promotion, marketing, operation, repair and maintenance of each of the Facilities. Management maintains its own staff to provide such services. The Debtor is currently utilizing Management post-petition. However, the Debtor is in discussions with the Indenture Trustee to obtain post-petition financing and as a condition for post-petition financing, the Indenture Trustee requires that the Debtor retain a Chief Restructuring Officer who will provide an independent analysis of the services provided by Management.

C.     **Construction of the Facilities.**

25.     The Debtor engaged HMC Contracting Services, LLC ("**HMC**"), a Texas limited liability company, as the general contractor for the construction of the Facilities. The Debtor and HMC entered into that AIA Standard Form Agreement dated as of May 1, 2013 for the construction of the IL Facility (the "**IL Agreement**"). The Debtor and HMC entered into a

4811-1022-9291.5

separate AIA Standard Form Agreement dated as of May 1, 2013 for the construction of the AL Facility (the "**AL Agreement**", and collectively with the IL Agreement, the "**Construction Agreements**"). Hartford Fire Insurance Company (the "**Surety**") issued Performance Bonds and Payment Bonds in connection with the Construction Agreements.

26.      Upon information provided to me, I believe one of the members of HMC is Kendall Phinney, who is an insider of the Debtor as described in paragraphs 21-23 hereinabove.

27.      HMC commenced construction of the Facilities in and around July 2013. The AL Facility was originally anticipated to be completed and available for occupancy in and around June/July 2014, and the IL Facility was to be completed and available for occupancy in and around August/September 2014. However, by spring of 2014, HMC was significantly behind construction schedule. At the same time the cost of construction was rising higher than anticipated. Upon information provided to me, I believe that also around spring of 2014, several key in-house and on-site HMC personnel that were critical for the construction of the Facilities left the company, leaving no one at HMC who had first-hand knowledge of the Facilities' needs and critical schedules. Upon information provided to me, replacement personnel put in by HMC, particularly for the on-site supervision positions, were not adequately qualified for those positions.

28.      While construction progressed at no more than a creeping pace, costs continued to run up at a much higher rate. The Debtor and HMC disputed various construction and cost issues. By June 2015, a year after the anticipated completion date, the AL Facility has been substantially completed and a certificate of occupancy has been issued, but a punch list with approximately $350,000 worth of work remains to be done before the AL Facility is able to pass the State of Texas inspections necessary before residents may move in. On the other hand, the

4811-1022-9291.5

IL Facility is far from complete. As of June 2015, construction on the IL Facility is estimated by independent contractors as being of no more than 60% to 65% complete.

29.     In July 2015, the Debtor and HMC participated in a mediation to resolve outstanding disputes. Pursuant to the mediation, the parties reached a limited agreement requiring: (a) the Debtor to pay an outstanding HMC invoice for work that had been performed prior to the mediation, and (b) HMC to finish the punch list for the AL Facility. Debtor paid the outstanding invoice as agreed. HMC, however, did not undertake the work to finish the punch list. HMC and the Debtor agree that the limited agreement was not consummated but the parties disagree as to the breaching party.

30.     On or about August 12, 2015, the Debtor sent HMC a written notice of default of the Construction Agreements asserting, among other things, that HMC failed to complete construction in a timely manner and on budget and failed to staff the construction project adequately.

31.     To the best of my knowledge, the last pay request HMC sent to the Debtor was for work done through May 31, 2015. To the best of my knowledge, HMC did not perform further work on the Facilities after May 31, 2015.

**D.     Indenture Trustee Actions**

32.     Upon Bond issuance, an amount was deposited into the Funded Interest Account sufficient to cover the Monthly Payments (as such term is defined under the Bond Documents) for interest due on the Bonds through the end of 2014. The Debtor anticipated that the Facilities would be completed in the summer/fall of 2014 and generating revenue by the end of 2014. However, because the Facilities were not completed on schedule, the Debtor has yet been able to generate any revenue. Without revenue, the Funded Interest Account was depleted by January

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 10**

2015. Subsequently, funds from the Reserve Fund were used to pay the July 1, 2015 debt service payment due on the Bonds. Funds drawn from the Reserve Fund to pay the July 1 2015 Debt service was thereafter restored by moving funds from the General Account of the Working Capital Fund to the Reserve Fund. All subsequent monthly debt service payments required under the Bond Documents were also made from the General Account of the Working Capital Fund. While using funds from the Working Capital Fund to meet debt service payments is permitted under the Bond Documents, the Working Capital Fund is also intended to fund, among other things, operating costs such as lease up, repair and capital improvements. The use of the funds in the General Account to meet debt service obligations has significantly reduced funds that would be available to pay future operating costs. As of the Petition Date the balance in the General Account of the Working Capital Fund was $461,552.85.

33.     While the Debtor juggled to meet debt obligation payments, construction cost overruns further contributed to the rapid depletion of the Construction Fund. In August 2015, the Debtor held a public meeting at the Facilities site (the "**August 19 Meeting**") that was attended by representatives of HMC, the Indenture Trustee, and holders of a majority of the principal amount of the outstanding Bonds (the "**Majority Bond Holders**"). At the August 19 Meeting, the Debtor disclosed that an estimated $3.25 million was needed to complete construction of the Facilities. However, approximately $1.67 million remained in the Construction Fund accounts. The Debtor requested the use of funds held in other funds/accounts to make up for the difference. The Debtor's request was denied by the Majority Bond Holders.

34.     On or about October 20, 2015, the Indenture Trustee sent a notice of Events of Default and Demand for Cure (the "**Default Notice**") to the Debtor. Among other things, the Indenture Trustee alleged that the Debtor (a) failed to complete construction of the Facilities

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 11**

with due diligence, (b) failed to cause the construction of the Facilities at a price within the amount of funds in the Construction Fund, (c) failed to make scheduled Monthly Payments, and (d) failed to make payment of the total amount due on the July 1, 2015 Payment Date. The Default Notice stated that the Bonds were outstanding in their full original principal amount of $33,910,000.

35.     On November 13, 2015, HMC filed a lawsuit against the Debtor and others in the County Court at Law No. 2 of Gregg County, Texas styled *Plaintiff's Verified Original Petition and Application for Temporary Restraining Order Against Defendants* (the "**HMC Action**"). The HMC Action alleges, among others, breach of contract and fraud claims. HMC also sought and obtained a Temporary Restraining Order (the "**TRO**") against the Debtor and other named defendants, including the Indenture Trustee.

36.     On November 17, 2015, the Indenture Trustee filed a petition against the Debtor in the HMC Action styled *U.S. Bank's Verified Petition and Request for Emergency Appointment of Receiver* (the "**Trustee Petition**"). The Trustee Petition seeks the appointment of a receiver.

37.     Prior to the Petition Date, upon advance of counsel, the Debtor interviewed candidates for a chief restructuring officer. The Debtor selected Robert Schleizer with BlackBriar Advisor LLC as the Debtor's restructuring advisor. However, after filing, the Indenture Trustee made it a requirement for providing debtor-in-possession financing that they approve of the Debtor's chief restructuring officer. The Indenture Trustee, on December 10, 2015, approved of Cohn Reznick; however, given the due daue of the Debtor's schedules and other required documents, agreed that Mr. Schleizer continue in this capacity through December 15, 2015. As such, the Debtor intends, with the Indenture Trustee's agreement, to seek approval

4811-1022-9291.5

of BlackBriar Advisors, LLC, as the Debtor's financial advisor through December 15, 2015, for assisting the Debtor with first day pleadings, preparation of a budget for obtaining post-petition financing, and preparation of schedules.

## E.   Objectives in Chapter 11

38.   I believe that the Facilities, once completed, will be able to generate revenue and allow the Debtor to service debt obligations within a reasonable period.   The Facilities are situated in a prime location within the city of Longview.   It is adjacent to the Longview Regional Medical campus that contains a Level III trauma hospital and numerous medical offices and service providers including a care and wellness center dedicated to the specific needs of senior adults.   It is also adjacent to a catholic church and school.   Finally, it is less than five minutes' drive to major popular grocery, shopping and restaurant chains including Target, Walmart, Sam's Club, Home Depot, Red Lobster, Outback Steakhouse, Panera, Chili's, and Appleby's.

39.   Consistent with industry practice, the Debtor marketed the Facilities during construction.   Both Facilities proved to be very popular.   By October 2015, the Debtor received deposits for 100% of available units for the assisted living portion of the AL Facility and deposits for 37% of available units for the IL Facility.   However, due to HMC's extended construction delays, many of the potential residents were forced to make other arrangements, and some passed away.

40.   In October 2015, the Debtor made the decision to return all of the deposits received because the Debtor could not be certain when the Facilities might be ready for residents to move in.   Nevertheless, the Debtor believes that the same level of interest exists for the AL Facility if it is completed in the near future.   Similarly, the Debtor believes that the IL Facility, once completed, would be received with the same level of interest.

4811-1022-9291.5

41.     The Debtor's operational and financial difficulties that led to the filing of this Case are chiefly the results of construction problems, delays, and cost overruns that started to surface soon after construction on the Facilities began.  Those problems are further complicated and exacerbated by the fact Mr. Phinney is an equity holder of HMC as well as a principal of the Debtor.

42.     Mr. Phinney's position as an owner of HMC created disputes between him and Mr. Green, the two Co-Presidents of Genpar, the Debtor's General Partner.  These disputes between the Debtor's decisions makers led to deadlock in the Debtor's management.

43.     It is my belief that if the deadlock among the Debtor's principals could be resolved and construction completed, I am optimistic that the Facilities will be able to generate income sufficient to allow the Debtor to adequately service the Bond Debt.  Alternatively, if construction is completed, the Debtor also has an option to sell either or both of the Facilities if a sale would better maximize the value of the Facilities.  I believe that a sale of either one or both of the Facilities in their current state could generate low offers and may not be in the best interest of the estate.  I therefore believe completing construction of the Facilities would be a reasonable and logical primary objective in this Case to maximize values for all stakeholders.

## III.
## EXPEDITED MOTIONS

44.     Concurrent with the filing of this Affidavit, the Debtor has filed the Expedited Motions and filed the appropriate request for expedited hearings on the Expedited Motions.

45.     Generally, the Expedited Motions are designed to meet the immediate goals of: (a) approval of secured post-petition financing with the Indenture Trustee as the post-petition lender; (b) putting in place Chad J. Shandler, a partner of CohnReznick LLP, as chief

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 14**

restructuring officer as required by the Indenture Trustee as a condition to providing post-petition secured financing; (c) ensuring that operations may continue without interruptions by ensuring utility services continue; and (d) keeping insurance policies in place post-petition.

46.     I have reviewed each of the Expedited Motions, including the exhibits thereto, and I believe that the relief sought in each of the Expedited Motions is narrowly tailored to meet the goals described above and, ultimately will be critical to the Debtor's ability to achieve success in this Case.

47.     The Expedited Motions are identified and more fully described below.

A.     EXPEDITED MOTION OF THE DEBTOR SEEKING INTERIM AND FINAL ORDERS (1) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (2) GRANTING LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) MODIFYING THE AUTOMATIC STAY, AND (4) SETTING AND PRESCRIBING FORM AND MANNER OF NOTICE FOR FINAL HEARING

48.     As of the filing of the DIP Financing Motion the Debtor and the Indenture Trustee have agreed on certain basic terms for the post-petition financing ("**DIP Financing**") but negotiations of other terms are ongoing. The DIP Financing Motion sets forth the basic terms that the parties have agreed to. The Debtor anticipates providing a draft agreed Interim Order filed before the interim hearing on the DIP Financing Motion.

B.     DEBTOR'S EXPEDITED APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF COHNREZNICK LLP AS RESTRUCTURING ADVISOR AND DESIGNATING CHAD J. SHANDLER AS CHIEF RESTRUCTURING OFFICER

49.     As a condition to obtaining post-petition financing, the Indenture Trustee requires the Debtor to retain CohnReznick LLP ("**CohnReznick**") as its Restructuring Advisor and designate Mr. Chad J. Shandler, a Partner at CohnReznick, as the Debtor's Chief Restructuring Officer ("**CRO**"). As set forth in more detail in the Application, the CRO's duties, among other

4811-1022-9291.5

things, is to provide the Debtor expert restructuring advise and have the sole authority to manage the Debtor's operations. CohnReznick will provide the ordinary course duties of a Restructuring Advisor to support Mr. Shandler in any of his duties as the Debtor's CRO.

C.  EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105(A) AND 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE, (II) DEEMING UTILITIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT

50.    While the Facilities are not operational at the time of the filing of this Motion, it is nevertheless critical for the Utilities to continue to provide services. As described above, the AL Facility is near completion and the Utilities are critical to keep everything in working order to facilitate the Debtor's efforts to complete the build out as quickly as possible. Similarly, the Debtor will seek to resume construction of the IL Facility as quickly as possible and would therefore require that the Utilities continue services and necessary to facilitate the resumption of construction work.

51.    Prior to the filing of the Utilities Motion, counsel for the Debtor attempted to contact each of the Utilities to discuss providing adequate assurance. At the time of the filing of the Motion, agreements had not been reached with all of the Utilities as to the proposed adequate assurance. Consequently, the Debtor requests the Court enter an order approving and adopting the following procedures (the "**Adequate Assurance Procedures**"):

(a)    As adequate assurance of future payment to each Utility listed in Exhibit A, the Debtor proposes to pay each Utility, to the extent such Utility does not already hold a deposit as of the Petition Date, within fifteen (15) days after entry of an order hereon, a deposit (collectively with any deposits provided prepetition, the "Deposits") identified in Exhibit A. With respect to each Utility that will be receiving a deposit in the amount proposed on Exhibit A and those Utilities that already hold a deposit from the Debtor as of the Petition Date as indicated on

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 16**

Exhibit A, each such Utility will be deemed to have received adequate assurance of payment, as that term is used in Section 366 of the Bankruptcy Code.

(b)  In the event any Utility is inadvertently left off the Utility Service List, the Debtor proposes to provide, upon discovery of those Utility or Utilities, adequate assurance of future payment to each of those Utilities not already holding a deposit, an amount equal to the approximate aggregate cost of two weeks of service. Each Utility will be deemed to have received adequate assurance of payment, as that term is used in Section 366 of the Bankruptcy Code;

(c)  If a Utility is not satisfied with the assurance of future payment being provided by the Debtor pursuant to the Motion, the Utility must serve a written request upon the Debtor setting forth the account number for the Debtor, the outstanding balance on the account, a summary of the Debtor's payment history on the account, and an explanation of why the adequate assurance provided in this Motion is inadequate. Additionally, the Utility may seek further relief from this Court in order to receive further adequate assurance;

(d)  A Utility may not alter, discontinue, or refuse further service to the Debtor until and unless the Utility receives authorization in the form of an order from this Court;

(e)  If, at any time during the post-petition period the Debtor fails to pay a regularly billed utility payment invoiced post-petition by the Utility (a "Post-Petition Utility Payment"), such Utility shall provide the Debtor and its bankruptcy counsel written notice of such failure outlining the account number for which such post-petition payment is due as well as the amount of the missed payment. The Debtor shall have five (5) days to cure such missed payment; and

(f)  At any time, the Debtor may terminate service from any Utility, such termination being effective immediately upon the Debtor's notice to the Utility. At such time, the Debtor shall not be required to make any further payments to such Utility for any services provided after such termination, and any excess deposit shall be returned within thirty (30) days.

52.  The Adequate Assurance Procedures proposed in the Utilities Motion provide for

a fair process that will allow the parties to negotiate and seek court intervention where necessary

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
<u>**PETITION AND REQUESTS FOR EXPEDITED RELIEF**</u> **– PAGE 17**

thereby preserving the Utilities' rights under Section 366 without jeopardizing the Debtor's bankruptcy case.

D.   DEBTOR'S EXPEDITED MOTION FOR AUTHORITY TO MEET OBLIGATIONS UNDER INSURANCE PREMIUM FINANCE AGREEMENT

53.   By the Premium Finance Motion, the Debtor requests the authority to continue to meet its payment obligations under the certain insurance premium finance agreement (**"Premium Finance Agreement"**) pursuant to Sections 105 and 363(c) of the Bankruptcy Code.   The Debtor seeks authorization to continue to pay the monthly installment payments consistent with prepetition practices in the ordinary course of the Debtor's business.

54.   The Debtor is required to maintain insurance pursuant to the Bond Documents. Furthermore, under the guidelines established by the United States Trustee, the Debtor is obligated to remain current with respect to certain of their primary insurance policies.  Paying for insurance coverage is therefore a fundamental, ordinary, and very essential component of the Debtor's business operations.

55.   Allowing the Debtor to meet the remaining payment obligations under the Premium Finance Agreement is in the best interest of the Debtor's estate and its creditors, and will not prejudice the legitimate interests of creditors and other parties in interest, including Debtor's secured creditors.

## IV.
## CONCLUSION

56.   The primary objective of the filing of this Case is to prevent deterioration of the current state of the Facilities and the hope to complete construction in order to protect and increase the value of the Facilities as well as the going concern value of the Debtor for the benefit of all of the creditors of the Debtor's estate.

4811-1022-9291.5

57.     For the reasons described herein and in the Expedited Motions, I believe that the prospect to increase the value of the Debtor's assets for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the Expedited Motions and respectfully request the Court to do so.

4811-1022-9291.5

**AFFIDAVIT OF ROSE RABON**
**IN SUPPORT OF THE DEBTOR'S CHAPTER 11**
**PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 19**

Dated: December 15, 2015

> Zerga Phin-Ker LP
> By:    Zerga Development, LLC, and
>           ZERGA Management, LLC
> Its: Authorized Agents
>
> By: Rose Rabon,
> Chief Financial Officer

STATE OF TEXAS

COUNTY OF _Collin_

    The foregoing instrument was acknowledged before me this 15th day of December, 2015, by Rose Rabon, Chief Financial Officer of Zerga Development, LLC, and ZERGA Management, LLC, as the Authorized Agents of the Debtor Zerga Phin-Ker LP.



PJ BROWN
My Commission Expires
December 13, 20‑‑

Notary Public, State of Texas

4820-8479-5180.1

AFFIDAVIT OF ROSE RABON
IN SUPPORT OF THE DEBTOR'S CHAPTER 11
PETITION AND REQUESTS FOR EXPEDITED RELIEF – PAGE 20